**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | | |
|---|---|---|---|
| SHAUN A. HODGE, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | No. | 3:16-CV-120-CLC-HBG |
| v. | ) | | |
| | ) | | |
| SHAWN PHILLIPS, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## MEMORANDUM OPINION

Petitioner, Shaun A. Hodge, by and through his attorney, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his confinement under a state-court judgment of conviction of first-degree premeditated murder (Doc. 1). Respondent filed a response in opposition to Petitioner's pleading, as well as a copy of the state record (Docs. 12–14). Petitioner filed a reply to Respondent's response (Doc. 15).

For the reasons set forth below, Petitioner's § 2254 petition (Doc. 1) will be **DENIED** and this action will be **DISMISSED**.

## I.     PROCEDURAL HISTORY

Petitioner was convicted by a Knox County jury of first-degree premeditated murder and sentenced to life imprisonment with the possibility of parole. *State v. Hodge*, No. E2002-01794-CCA-R3-CD, 2003 WL 22888892, at *9 (Tenn. Crim. App. Dec. 8, 2003), *perm. app denied* (Tenn. May 10, 2004). On direct appeal, the Tennessee Court of Criminal Appeals (the "TCCA") affirmed the conviction. *Id.* The Tennessee Supreme Court (the "TSC") denied Petitioner's application for permission to appeal. *Id.*

Petitioner filed a timely pro se petition for post-conviction relief. *Hodge v. State*, No. E2009-02508-CCA-R3-PC, 2011 WL 3793503 (Tenn. Crim. App. Aug. 26, 2011), *perm. app. denied* (Tenn. Feb. 15, 2012). Thereafter, counsel was appointed to represent Petitioner and filed an amended petition. *Id*. Following an evidentiary hearing, the post-conviction court denied relief. *Id*. The TCCA affirmed the denial and the TSC denied Petitioner's application for discretionary review. *Id*.

Petitioner, next, filed a petition for writ of error coram nobis. *Hodge v. State*, No. E2014-01005-CCA-R3-ECN, 2015 WL 4111767 (Tenn. Crim. App. Jul. 8, 2015), *perm. app. denied* (Tenn. Dec. 10, 2015). Following a hearing, the coram nobis court denied relief. *Id*. The TCCA affirmed the denial, and the TSC denied Petitioner's application for discretionary review. *Id*.

Petitioner filed a timely petition for a writ of habeas corpus on March 14, 2016 (Doc. 1). This matter is now ripe for the Court's review.

## II.    BACKGROUND

The TCCA summarized the facts of this case in its opinion on direct appeal as follows:

Between 8:00 and 9:00 a.m. on Sunday, April 26, 1998, Benny Boling was gunned down in the Austin Homes Community of Knox County. Numerous residents and visitors in the community that morning witnessed some or all of the events surrounding the shooting. No murder weapon was ever recovered, and no forensic evidence tied any particular suspect to the homicide. The shooting was believed to be drug related.

During the initial stages of the police investigation, many witnesses were reluctant to become involved or come forward with information. Approximately ten months elapsed before the defendant was arrested and charged with one count of premeditated first-degree murder. The state did not seek either the death penalty or life without the possibility of parole. The defendant pleaded not guilty and invoked his right to trial by jury.

We recount the trial evidence in the light most favorable to the state. The state opened its proof with the testimony of Gerald Smith, a senior evidence technician with the Criminal Investigation Division of the Knoxville Police Department. Before joining the ranks of the Knoxville Police Department, Mr. Smith had retired

from (sic) Tennessee Bureau of Investigation after working 27 years in the crime laboratory.

Mr. Smith testified that he was called at 8:58 a.m. on April 26, 1998, and dispatched to process a homicide crime scene in the area of Austin Homes near the intersection of Mee Street and Hanson Avenue. By the time Smith arrived, the victim's body had been taken to the hospital. The victim's truck had run off the road and had come to rest at the Mee Street-Hanson Avenue intersection. The victim had escaped from the truck and fled approximately 75 feet up a hill before collapsing and dying.

Smith testified that he recovered a combination of seventeen nine millimeter bullet casings and bullet fragments from the crime scene. He explained that the casings indicated that a nine millimeter, semi-automatic handgun had fired the rounds. Smith said that he identified a total of ten rounds of ammunition that had been fired at the truck, five of which entered the cab of the truck. The medical examiner who performed the autopsy turned over to Smith one bullet that had lodged in the victim's left leg and a bullet fragment taken from the victim's left arm. Subsequent testing results, to which the state and defense had stipulated, revealed that the seventeen cartridge casings/fragments had been fired from the same type of firearm and that markings on eight of the casings/fragments showed that they had been fired by the same firearm.

Smith stated that no identifiable fingerprints were found inside the truck and that no weapon was ever recovered. Another investigator at the scene turned over to Smith a $100 bill that the victim had clutched in his hand. Smith testified that based on the bullet holes in the truck, it was his opinion that the shots were fired at a distance of four feet or more from a position slightly to the rear of the driver's side of the truck. Also, in Smith's opinion, the nonlethal wounds to the victim's left leg and arm occurred while the victim was still in the truck. The victim's body had three other wounds, one of which was fatal. The fatal shot entered the right side of the victim's back and exited the front of the chest. Smith was unable to determine which, if any, of the recovered bullet fragments was the fatal bullet.

Doctor Sandra Elkins, Knox County's Medical Examiner, testified and corroborated Smith's identification of the fatal gunshot wound with an entry point on the right side of the victim's back and an exit point on his chest to the left and slightly upward approximately seven inches. Most of the other gunshot wounds that the victim sustained were to the back of his left buttocks and the left leg area; none of the entry wounds were on the front of the victim's body. Doctor Elkins reported that a drug and alcohol screen of the victim's blood showed the presence of a low concentration of alcohol but a high concentration of cocaine.

The state called four witnesses who identified the defendant as the shooter. The theory of defense was that these witnesses had either accidently or intentionally identified the wrong person. The state's witness Debra Turner was in the latter

category. Turner had lived for five years at Apartment 161, 1283 Nelson Circle. Her apartment faced Hanson Avenue.

Turner testified that she had known the defendant, whose nickname was "Fat Shawn," most of her life. The defendant formerly lived in Austin Homes, and at the time of the shooting, his grandmother resided in Austin Homes. Turner said that she saw the person who killed the victim. Turner stated that she did not know the victim and had never seen him before the day of the shooting.

Turner testified that shortly before the shooting, she was in her kitchen making preparations for Sunday dinner. She said that she heard voices and an argument outside her back door. Turner claimed that she heard one voice saying, "Dude, you will not leave these projects alive if you don't buy this damn dope from me." Turner gave conflicting testimony whether her back door was open or closed at the time, but at any rate, she stepped to the back door and looked outside. Turner stated that she saw the defendant talking to a white male who was sitting inside a parked truck. The defendant was wearing blue jeans and a "black hoody." Turner testified that she heard the man in the truck tell the defendant that he "did not come to buy no drugs," and then she heard a gunshot and saw the truck moving away from the scene. Turner said that the defendant followed the moving truck and fired into it. The truck hit a fence and stopped. Turner related that the man then jumped out of the truck, and as he was running across the street, the defendant fired at the man. According to Turner, after the man fell, the defendant "stood over him and shot him." Turner described how she watched what happened first from her back door and then from the side and front windows in her apartment. Turner testified that she never heard the victim threaten the defendant and did not see any weapon in the victim's possession.

After the police arrived at the scene, officers began questioning people in the area about the shooting. Turner admitted that she told officers that she had not seen anything, but she insisted that later that night she made a telephone call and anonymously reported what she knew about the crime. It was not until February 9, 1999, that she came forward, gave a statement to the police, and identified the defendant from a photo spread.

On cross-examination, the defense elicited that Turner had two prior theft convictions. The defense also vigorously cross-examined Turner about the line of sight at her back door and windows and about the location of the truck when she first saw it. Turner amended her earlier testimony and stated that when she first saw the victim, he was outside of the truck talking to Tim Bolden, whose nickname was "Tim Dog." She next saw the defendant approach and threaten the victim, and the shooting began. Turner said that she did not know where Bolden had gone after the first shot was fired.

Turner stated that the reason she did not initially talk with the police officer at the scene was that the defendant was standing nearby at the time and that she was afraid

of him. When Turner finally talked with the police, she called them from the University of Tennessee Medical Center. Detectives came to the hospital, transported Turner for questioning, and then took her back to the hospital. Turner admitted that she was at the hospital with her son who had been seriously injured when the defendant and two other men "jumped on him and beat him with a bat." At the time Turner testified, the assault case against the defendant was still pending. Turner agreed that she was angry with the defendant because he had injured her son, and in the statement given to the detectives, she said that she had decided to come forward because her son had been beaten.

Turner maintained that she had not accused the defendant in retaliation for her son's injuries. She denied using cocaine in her apartment with a man named Curry Dixon when she learned about the beating, and she denied telling Dixon that she would "mess" the defendant up because of what he had done to her son. She also denied making any similar statement to the defendant's cousin, Taiwan Fowler.

Patricia Hamilton also identified the defendant as the shooter. Hamilton lived in Georgia at the time of the crime but was visiting with relatives in Knoxville and staying with her cousin, Debra Turner. Hamilton admitted that she had a prior conviction for selling cocaine and was on probation. Hamilton recalled being downstairs, sitting and talking to Turner when the "commotion" began. Hamilton said that she asked Turner if someone was firing a gun. She testified that Turner peeped out of the window and reported that "Fat Shawn" was shooting. Hamilton was certain of the identification because she had known the defendant all of her life. Hamilton also looked out of the window; she saw the victim get out of the truck and run toward the daycare center up the hill with the defendant in pursuit shooting at the victim. Hamilton said that she did not want to get involved in the police investigation and, therefore, stayed inside the house.

A third witness who lived in Austin Homes and identified the defendant as the shooter was Lorraine Young. Young lived at 1240 Nelson Circle, Apartment 187. She knew the defendant and was friends with Debra Turner. Young testified that she was awake Sunday morning but lying in bed when she heard a commotion and went to her bedroom window. Young testified that she saw the defendant and three other boys near the victim's truck having an argument about "dope and money." Young identified one of the other boys by the nickname "Country." Young said that she heard the victim tell the boys that he did not want any more drugs because he had spent all of his money, and she heard the defendant respond that "you're gonna buy my dope or else." At that point, Young put on some clothes and went to the back door in time to see the victim wreck his truck and flee on foot while the defendant shot the victim.

Young said that after the victim fell and the shooting stopped, the defendant came to her door and wanted to come inside the apartment. When Young declined to grant him entry, the defendant walked away. Young testified that the defendant had a gun in his hand when he came to her door. Young testified that she recalled

seeing the victim on Saturday evening when he drove into the neighborhood and purchased drugs from a man who Young identified as "Grill."

On cross-examination, Young testified that on the morning of the shooting she was in bed with her boyfriend. The defense examined her closely about the view out of her bedroom window. Young had given the police a statement in which she said that she and her boyfriend were in bed drunk, but at trial she denied being intoxicated or making that statement to the police. Young did admit that at first she told the detectives that she did not know anything and could not identify the shooter. Young elaborated further that she had seen the victim drive into the neighborhood and purchase drugs approximately five times on Saturday.

Two additional witnesses who testified for the state were Albert Banks and Keesha Towns. Towns lived in Austin Homes when the shooting occurred, and she knew the defendant. Towns was on her back porch Sunday morning and saw approximately eight men gambling on the porch of the apartment directly across from where she was standing. The defendant and Tim Bolden were among the gamblers. Towns testified that "an incident or argument or something broke out and everybody took off running." Towns heard gunshots, but she did not actually see anything happen. She was uncertain whether the defendant had a gun.

Banks testified that he was sleeping in his mother's apartment when he awoke to gunshots on Sunday morning. He peeped out of the window next to the bed and saw a person he did not know shooting a gun. Banks could not recall what the shooter was wearing, and he did not see at whom or what the person was shooting.

The final witness in the state's case in chief was Tim Bolden, known as "Tim Dog." At the time of his testimony, Bolden was serving an incarcerative sentence for voluntary manslaughter, and he had pending drug and reckless endangerment charges. Bolden testified that the state had agreed to a sentence of four years on the pending charges, to run consecutively to his ten-year voluntary manslaughter sentence, in exchange for his truthful testimony.

Bolden testified that he lived in Austin Homes and knew the defendant from the neighborhood. Bolden explained that he was selling drugs in the area on Saturday when the victim spent approximately $600 to $800 on crack cocaine. According to Bolden, the victim made multiple trips into the neighborhood that day to purchase crack cocaine from Bolden. The last time the victim left was around 2:30 or 3:00 on Sunday morning.

Bolden testified that at 5:00 or 6:00 a.m. he saw the defendant. Bolden was gambling with four or five other men, and the defendant joined them. Later, the victim once again drove into the neighborhood, but Bolden did not approach the truck. Instead, the defendant walked toward the truck. Bolden testified that he heard the victim's loud voice, saw the victim pulling out in his truck, and saw the defendant firing a gun. The defendant, Bolden maintained, was the only person

shooting and the only person who had a gun. Bolden testified that he also saw the victim's truck run up on a curb, the victim leave the truck and flee, the defendant continue to shoot, and the victim fall. To Bolden's knowledge, the victim was not armed. Bolden explained that after the shooting stopped, everyone tried to disperse because they knew the police would arrive shortly.

The police captured Bolden and transported him to the police station for questioning. Bolden admitted that at first he did not tell the detectives the truth. Bolden stated that later, however, while he was still in custody, he told the truth that the defendant shot the victim. Asked to explain why he decided to tell the police about the defendant's involvement, Bolden testified, "I really guess I felt that I-I didn't want to take the blame for it basically. That's the basic answer really. I didn't want to take the blame for it."

Not surprisingly, the defense aggressively cross-examined Bolden, covering credibility issues such as testifying in exchange for sentencing leniency and wanting to avoid being charged with the homicide. The defense also highlighted inconsistencies between Bolden's statements to the police and his trial testimony, particularly as related to location and street names.

The defendant did not testify, but he offered the testimony of nine witnesses.

Renee Stone, who was living in Austin Homes at the time of the shooting, testified that she was driving home the morning of the shooting when a woman stopped her and advised her of the shooting. Stone drove up the hill in front of the daycare center and saw a man lying on his stomach on the ground. Stone went to her apartment and called 911. When she walked back to the scene, the paramedics were arriving. Stone did not witness the shooting or hear any gunshots.

Latroy Askew, who was serving an incarcerative sentence for reckless endangerment and aggravated assault, testified that the night before the shooting he and the defendant rode around all night in Austin Homes. The next morning, Askew recalled being around a group of men gambling, including the defendant and Bolden. According to Askew, the defendant was wearing a yellow sweater with a hood, and Bolden was dressed in black. Askew said that he and the defendant left about the same time, before the shooting. The defendant mentioned going home or to his girlfriend's house. On cross-examination, Askew agreed that he and the defendant were good friends. Askew could not recall what day of the week that the shooting occurred, and he admitted that he was aware of other shootings in Austin Homes.

Defense witness Glenda Ward did not live in Austin Homes and was not familiar with or related to any of the witnesses in the case. In April 1998, Ward was living in Town View Apartments across from Austin Homes on Summitt Hill. Ward testified that she could see the daycare center in Austin Homes from her apartment. Ward recalled that she happened to be looking out of her window one morning and

saw one man chasing another man. Ward said that the man in the lead was trying to run up the hill, and the other man shot him. Ward saw the man who was shot fall down, and she saw the shooter run in the oppositive direction toward Austin Homes. Ward described the shooter as about six feet tall, 190 pounds, and wearing dark clothing. Ward said that she did not get a good look at the face, but she knew "he was like dark-skinned, dark complected." The defendant then stood up in the courtroom, and defense counsel asked Ward if the defendant was the shooter. Ward said that the defendant was not who she saw.

The state sought to discredit Ward's testimony by challenging what she could have seen from her apartment. The police interviewed Ward in 1998 as part of the shooting investigation, and she advised the officers that she witnessed the murder but could not identify the shooter. At that time, Ward described the shooter as a black man dressed in a dark hooded jacket with dark pants. At trial, Ward agreed that she did not mention the shooter's skin tone previously, but she insisted in response to state questioning that from where she was standing, and even though the shooter had the hood of his jacket over his head, she could see the shooter's skin tone, which was dark, not light.

Defense witness Reginald Woodruff testified that he had grown up with the defendant in Austin Homes. At the time of the shooting, Woodruff was living in Town View Apartments across from Austin Homes. Woodruff testified that he was home with his son on the morning of the shooting. The defendant, Woodruff said, came to his apartment dressed in a gold pullover sweater jacket. Woodruff stated that the defendant did not have a weapon with him, and Woodruff recalled that the defendant was acting as if something was wrong. About five or ten minutes later, Malik Hardin showed up at the apartment to play video games with Woodruff. Woodruff estimated that the group stayed in his apartment two hours. After Hardin left, Woodruff said that he, his son, and the defendant left to get something to eat.

On cross-examination, the state exploited the witness's inability to recall when the events occurred, other than possibly on a Sunday. Woodruff was certain that the year was 1998, and he believed it was around the end of the year, after Thanksgiving. The state also tried to raise questions about Woodruff's memory in terms of recalling what the defendant was wearing. Woodruff insisted that he specifically recalled the gold-type sweater jacket "because [his] son kept calling him big bird."

Austin East High School student Pierre Jarrett was thirteen years old at the time of the shooting. On the day of the crime, he was playing basketball in the Austin Homes neighborhood, and he saw a gray truck going up the hill by the daycare center. The truck turned, and Jarrett said that he heard approximately ten gunshots. Jarrett testified that at the sound of the shots, he looked up the hill and saw that the truck had come to rest with the passenger side door open. Jarrett stated that he also saw a man dressed in black who had a gun. Jarrett told the police what he had seen when he was interviewed. Jarrett said that he was positive that the defendant was

not the man he saw with the gun in his hand. The state cross-examined Jarrett to bring out inconsistencies between his testimony and his police statement, including the differences in how he had described the shooter.

Paul Chandler was almost caught in the gun fire on Sunday morning. This 70-year-old witness was retired from the United States Army after 24 years of service. He lived within walking distance of Austin Homes, where he frequently went to collect discarded cans to later sell. Chandler testified that he was at the top of the hill near the daycare center. He set down a garbage bag of cans and lit a cigarette. Chandler said that he heard a vehicle and shooting. He explained that he could not see who was doing the shooting and that he was afraid to move. Chandler believed that if he had not stopped to take a break, he would have been between the truck and the shooter. Chandler testified that he saw the victim get out of the truck, run past him, turn a corner, and then collapse.

Chandler described the shooter as tall and thin and wearing a brown cap and jacket. When the police arrived, Chandler pointed out the direction in which the shooter headed. At trial, Chandler said that as the shooter walked off, Chandler heard him say, "I got him." The defendant stood up in the courtroom, and Chandler stated that the defendant was not the shooter. The state questioned Chandler at length about a photo spread he was shown by the police; evidently, he had identified as the shooter a man who was in prison at the time of the shooting. The state also elicited from Chandler that the shooter he saw was carrying a .357 Magnum handgun.

The defense called two witnesses who testified specifically about Debra Turner and statements she had made about identifying the shooter. The first witness, Curry Dixon, was serving a sentence for robbery. He had known the defendant all his life. Dixon testified that one evening he and Turner were smoking crack at her house. Dixon recalled that someone knocked on the door and advised Turner that her son had been beaten. Turner left and returned a short time later. Dixon stated that when she returned, Turner threatened that she was going to implicate Fat Shawn in a murder, even though the defendant was not involved.

Defense witness Taiwan Fowler related a similar conversation that he had with Turner. Fowler was related to the defendant but had never lived in Austin Homes. Fowler testified that he had known Turner for several years and that he did not believe her to be truthful. Fowler said that he had spoken to Turner within the past year and that she was going to give an untruthful statement to get back at the defendant for putting her son in the hospital.

The final defense witness was Malik Hardin, the defendant's cousin. He testified that he was with the group of men gambling on the porch of the apartment in Austin Homes early Sunday morning. Hardin said that the defendant was present also gambling. A truck drove into the area, and Hardin recognized it and the man driving because Hardin and "Tim Dog" had been selling the man drugs the previous

evening. Hardin related how the shooting began. He stated that he, "Tim Dog," and a third man, "Wutang," were walking toward the truck. "Tim Dog" asked the other two men to "back him" because the man in the truck had "shorted him for money." Hardin said the victim had a $100 bill and that Hardin was "about to serve him" when "Tim Dog" pulled out a gun, told the other two to back up, and started shooting. Hardin ducked to the ground; he said that he heard five to seven shots and then took off running. While running, Hardin heard approximately eight more shots.

Hardin testified that the last time he saw the defendant, the defendant was still gambling. Hardin ended up first at a crack house, and then he encountered Reginald Woodruff. Hardin stated that the two men went to Woodruff's house where the defendant and Woodruff's son already were. Hardin did not recall how the defendant was dressed. Around noon, Hardin left Woodruff's house; the defendant was still there. Hardin said that he was going to his sister's place in Austin Homes. His visit, however, was interrupted by the police who took him into custody. Hardin stated that he could not recall giving a statement to the police.

The state cross-examined Hardin about his prior record, which included two felony drug convictions and two attempted robbery convictions. In addition, Hardin was currently serving a federal sentence involving a gun charge. The state questioned why Hardin did not come forward with the information earlier. Hardin responded that he was not a "snitch" and that he was fearful of what might happen to his family. Hardin said that he had changed his mind because his grandmother had since died and most other family members were now in jail. The state again took Hardin through the events leading up to the shooting. Hardin insisted that the victim came "to buy dope" and was about to spend $100 when "Tim Dog" intervened and began shooting.

In rebuttal, the state called Officer Russell Whitfield of the Criminalistics Division. He identified various photographs that he had taken showing different parts of the Austin Homes area. Officer Whitfield also testified that he went into a third-floor apartment in Town View Apartments and took photographs in the direction of Mee Street. Although it is difficult to follow Officer Whitfield's testimony, it appears that his testimony was offered in an effort to contradict the testimony of the defense witnesses who testified that they had seen the shooting from their respective residences in Town View Apartments.

*Hodge*, No. 2003 WL 22888892, at *1–8.

The opinion of the TCCA affirming the decision of the post-conviction court contains a recitation of the evidence presented at the evidentiary hearing held by the post-conviction court and summarizes the testimony heard from Petitioner's trial counsel and numerous other witnesses

in that proceeding. *Hodge*, 2011 WL 3793503; *Hodge*, 2015 WL 4111767. To the extent the facts and evidence from Petitioner's post-conviction relief hearings are relevant to the claims raised by Petitioner in his § 2254 petition, they will be addressed in more detail below in the analysis of those specific claims.

### III.    STANDARD OF REVIEW

A state prisoner is entitled to habeas corpus relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, which amended § 2254, sets forth "an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007). By this standard, when a state court adjudicates a claim on the merits, habeas relief is available only if the adjudication of that claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's ruling is an "unreasonable application of" clearly established federal law if the state court identifies the correct governing legal principle from Supreme Court precedent but unreasonably applies it to the facts of the particular state prisoner's case. *Id*. at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id*. at 411.

Under AEDPA, a habeas petitioner must "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This standard is "difficult to meet," "highly deferential," and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Harrington*, 562 U.S. at 102; *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

## IV.    PETITIONER'S ALLEGATIONS

Petitioner's § 2254 habeas corpus petition raises the following claims for relief:

(1) Whether Petitioner received ineffective assistance of counsel;
     a.  Was counsel ineffective for failing to obtain the mental health records of Lorraine Young;
     b.  Was counsel ineffective for failing to interview Tim Bolden without an audio recording device; and
     c.  Was counsel ineffective for failing to provide "meaningful representation" due to a conflict of interest;

(2) Did the State withheld material, exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

(*See* Doc. 1).

## V.    INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant has a Sixth Amendment right not just to counsel but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the proceedings unfair and the result unreliable. *Id*. In assessing counsel's performance, a court must presume that

counsel's questioned actions might have been sound strategic decisions and must evaluate the alleged errors or omissions from counsel's perspective at the time the conduct occurred and under the circumstances of the particular case. *Id.* at 689; *see also Vasquez v. Jones*, 496 F.3d 564, 578 (6th Cir. 2007) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]") (quoting *Strickland*, 466 U.S. at 690). Only when the challenged actions are "outside the range of professionally competent assistance" will counsel's performance be considered constitutionally deficient. *Strickland*, 466 U.S. at 690.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691; *see also Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). On balance, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

When a petitioner raises an ineffective-assistance-of-counsel claim in a § 2254 petition, the Court must review the state court's ruling on that claim under AEDPA's highly deferential standard. Thus, in order to succeed on a federal claim of ineffective assistance of counsel, a habeas petitioner must demonstrate that the state court's ruling on his-ineffective-assistance-of-counsel claim was an unreasonable application of *Strickland*. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). "Surmounting *Strickland*'s high bar is never an easy task," and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (citing *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). The question under

*Strickland*, is not whether this Court believes the State court's determination was incorrect, but whether that determination was unreasonable. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

**A.    Was the trial counsel ineffective for failing to obtain the mental health records of Lorraine Young?**

Young was a witness for the State who testified that she saw Petitioner shoot the victim. Young has extensive mental health records which were not produced or discovered by either counsel for the state or defense at trial (Doc. 12-20 at 109). Petitioner claims his conviction and sentence are void because trial counsel was ineffective for failing to obtain Young's mental health records (Doc. 1). Petitioner asserts that trial counsel's pretrial discovery request, specifically requested Young's mental health records; however, he did not seek an order compelling such disclosure (Doc. 1 at 52). Additionally, Petitioner argues that unlike post-conviction counsel, trial counsel took no independent action to secure Young's mental health records, either via a court order or interviewing Young (*id.*).

Following an evidentiary hearing on this issue, the state post-conviction court rejected this ineffective assistance of counsel claim finding that trial counsel was not deficient and that Petitioner suffered no prejudice (Doc. 12-20 at 107). Extensive proof at the post-conviction hearing was presented regarding Young's mental health records which indicate depression, thought disorders, suicidal and homicidal ideations and sleep disorders as well as physical problems (*id.*). Nowhere in the record did Young receive treatment or complain of mental health issues at or around the time of the offense itself (*id.*). Although she did receive treatment at the time of trial and had had significant stressors, her testimony was found to be clearly given (*id.*). She was effectively cross-examined at trial and there is no showing that her mental health problems impaired her ability to recall or her testimony (*id.*).

The TCCA affirmed the post-conviction court's finding and addressed this issue as follows:

14

The petitioner's first claim is that his trial counsel was ineffective for failing to obtain and use the mental health records of Ms. Lorraine Young. Prior to trial, the petitioner's trial counsel requested that the State turn over any mental health records relating to any of the State's witnesses, including Ms. Young. The prosecutor responded by advising trial counsel that she was not aware of Ms. Young ever receiving treatment for mental health issues. The petitioner's counsel also attempted to contact Ms. Young by telephone and interview her prior to trial. However, she refused to speak with him.

The petitioner argues that these attempts to obtain Ms. Young's mental health records were constitutionally insufficient. The petitioner argues that trial counsel should have conducted an inquiry into Ms. Young's mental health history similar to the one done by postconviction counsel. However, we disagree. There appears to be no reason in the record for trial counsel to have suspected that Ms. Young suffered from mental health problems. Although the petitioner had known Ms. Young for a period of many years, it does not appear from the record that the petitioner raised the issue of Ms. Young's mental health issues with his trial counsel. Without something in the record to indicate that his trial counsel was placed on notice that Ms. Young suffered from any significant mental health problems, we do not believe that trial counsel fell below an objective standard of reasonableness in failing to investigate this issue further. Trial counsel's performance here has not been shown to be deficient.

*Hodge*, 2011 WL 3793503, at *4–5.

This Court finds that the state court correctly identified and applied *Strickland* to address this claim, and the record supports the state court's conclusion. Petitioner acknowledges that trial counsel requested Youngs mental health records prior to trial[1] and when those records were not produced by the State counsel he sought to compel their disclosure[2]. Trial counsel testified in the post-conviction evidentiary hearing that both himself and an investigator attempted to speak with Young, but she refused to talk because "the DA told her not to talk to [trial counsel]" (*See* Doc. 12-21 at 33, 57).

---

[1] *See* Motion for Discovery, Inspection, and Notice of Intent to Use Evidence, Doc. 12-1 p. 15-18.

[2] *See* Motion to Compel, Discovery and, in the Alternative for Sanctions, Doc. 12-1 p. 45-46.

Petitioner argues that the timing of trial counsel's discovery requests "suggests" that trial counsel became aware of Young's issues prior to trial (Doc. 1 at 52). The TCCA, however, found otherwise stating that "[w]ithout something in the record to indicate that his trial counsel was placed on notice that Ms. Young suffered from any significant mental health problems, we do not believe that trial counsel fell below an objective standard of reasonableness in failing to investigate this issue further." *Hodge*, 2011 WL 3793503, at *5. Further, nothing in the records indicates how Young's alleged mental impairments affected her perception or testimony at trial. On the contrary, the records show that Young's testimony was clear and that she was effectively cross-examined at trial. Thus, Petitioner has not provided sufficient evidence to satisfy the second prong of *Strickland* to show that the outcome of his trial would have been different had trial counsel obtained Young's mental health records.

Accordingly, this Court finds that Petitioner has not met his burden of demonstrating that he is entitled to relief on this claim as he has not provided any evidence to diminish the deference owed to the state court's factual findings under § 2254(d). Petitioner may disagree with the result reached by the state courts, but he failed to describe how the state court's adjudication of his claim was anything other than reasonable under the *Strickland* standard. Based on this Court's review of the record, the state court's decision met the AEDPA standard of review because it was not contrary to and did not involve an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.

### B. Was the trial counsel ineffective for failing to make an audio recording of his interview with a witness?

Petitioner contends that trial counsel was ineffective because he interviewed a witness, Timothy Bolden, without a recording device or a third-party present (Doc. 1 at 53).

The defense's theory of the case was that the prosecution's four eyewitness identifications were erroneous and that Bolden may have been the actual killer. *Hodge*, 2011 WL 3793503, at *2. Trial counsel met with Bolden at the detention center prior to trial. In this first meeting, Petitioner alleges that Bolden made comments that would affirm their defense that Petitioner did not shoot the victim (Doc. 1 at 54). During a second meeting, Bolden told trial counsel that he did not want to talk about the incident anymore and that he would not be testifying (*Id.*). However, Bolden did testify and his trial testimony directly implemented Petitioner as the shooter (*Id.*).

Thereafter, trial counsel examined the "unusual possibility" of personally taking the stand to testify concerning inconsistencies between Bolden's courtroom testimony during the State's case and prior statements that Bolden had allegedly made to him at an unrecorded prison meeting. *Hodge*, 2011 WL 3793503, at *2. Trial counsel had availed himself of the opportunity to cross-examine Bolden concerning inconsistent statements while the witness was still on the stand, but Bolden had claimed under oath that he could not recall making any of them. *Id.* After considering the matter, the trial court gave trial counsel permission to testify regarding his meeting with Bolden. However, after consulting with Petitioner, trial counsel decided not to take the stand, explaining that Bolden had not been a credible witness and that opening himself up to cross-examination would not be in Petitioner's best interests. *Id.* Petitioner testified that, at the time the decision was made, he agreed with trial counsel's decision not to testify (Doc. 12-31 at 69).

The TCCA addressed this issue as follows:

> The petitioner next claims that his trial counsel was ineffective for interviewing Tim Bolden without bringing a third-party witness or making an audio recording of the interview. Because he failed to bring a witness or recording device to the interview, the petitioner claims that trial counsel was unable to effectively cross-examine Mr. Bolden at trial with inconsistent statements that he made during his interview.

However, the record does not establish that the petitioner's former trial counsel was deficient in his performance with respect to this interview. According to the testimony of the petitioner's trial counsel at the post-conviction hearing, counsel intentionally chose to entice Mr. Bolden to speak to him by offering to come alone and not to tape the interview. Although interviewing under those circumstances would likely render it difficult to impeach Mr. Bolden in the future with any inconsistent statements, speaking to the witness in this unrecorded fashion could have potentially been very helpful to trial counsel in developing the petitioner's case and trial strategy. Moreover, according to his testimony, trial counsel hoped to bring witnesses and/or tape Mr. Bolden at subsequent interviews after gaining Mr. Bolden's trust. However, Mr. Bolden contacted the petitioner's trial counsel some days after the initial interview and advised him that he was not going to talk further with him about the crime. Consequently, although his strategy ultimately failed, trial counsel's decision to attend Mr. Bolden's interview without a witness or recording device does not appear to us to have been deficient at the time it was made.

*Hodge*, 2011 WL 3793503, at *5.

This Court finds that the state court's adjudication on this issue was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence before the state court. At the time trial counsel conducted his interview with Bolden (who had two felony cases pending) Bolden's attorney only agreed to the interview if counsel went alone and did not tape the interview (Doc. 12-21 at 38). After speaking with Bolden, trial counsel contacted Bolden for a second meeting and planned to tape Bolden's statements if they were consistent with what he said in the first interview (*id*.). However, during this second interview, Bolden advised trial counsel that he "wasn't going to talk anymore about it, he was not going to testify." (*Id*.). Thus, trial counsel never had the opportunity to record Bolden's statements.

Here, Petitioner failed to meet his burden of proof to refute the presumption of correctness offered to the state court's finding that the decision not to record the initial interview was strategic in order to build the witness's trust under these circumstances. And it was further, not deficient of

trial counsel to not testify at trial in order to avoid opening himself up to cross-examination. Accordingly, Petitioner is not entitled to relief on this claim.

### C.     Was the trial counsel ineffective due to conflict of interest?

Petitioner claims that trial counsel was ineffective for not withdrawing when a conflict arose between himself and Petitioner due to complaints Petitioner made against trial counsel in the trial court and before the Board of Professional Responsibility (Doc. 1 at 62). Petitioner asserts that he filed a "Motion for Dismissal of Attorney of Record", along with four letters following up on his request for a new attorney (*id*. at 63). In addition to the letter sent to the Court, Petitioner also sent a letter to the Knoxville Bar Association and the Tennessee Board of Professional Responsibility expressing complaints against trial counsel (*id*.). Petitioner complains that the trial judge never conducted a hearing or inquired about Petitioner's dissatisfaction with his counsel (*id*.).

Petitioner challenged the effectiveness of his trial counsel on this issue during his state post-conviction proceedings and, following an evidentiary hearing, the post-conviction court rejected the claim. The TCCA affirmed the post-conviction court's finding and addressed this issue as follows:

> Finally, the petitioner claims ineffective assistance of counsel because his trial counsel failed to withdraw after the petitioner wrote a letter to the Board of Professional Responsibility (the "Board") and several letters to the trial court complaining about his counsel's representation prior to trial. However, we have previously indicated that trial counsel is not required to withdraw representation merely because a client has filed a complaint against him with the Board. *See Quentin Lewis v. State,* No. W1998–00793–CCA–R3–PC, 2001 Tenn. Crim. App. LEXIS 52, ——11–12, 2001 WL 55635 (Tenn. Crim. App. Jan. 23, 2001) (holding trial counsel's performance was not rendered constitutionally deficient by virtue of her failing to request to withdraw after appellant filed a complaint against her with the Board); *Cf. State v. Richard Higgs,* No. W2000–02588–CCA–MR3–CD, 2002 Tenn. Crim. App. LEXIS 667 at ——6–10, 2002 WL 1841697 (Tenn. Crim. App. Aug. 5, 2002) (although three complaints had allegedly been filed with the Board concerning trial counsel by the defendant at the time of trial, the defendant had "not

provided this Court with sufficient information to determine that there existed a conflict of interest requiring defense counsel's withdrawal"). Any rule that would essentially permit a defendant to automatically discharge his appointed counsel simply by raising written complaints would inevitably become the subject of delaying tactics and abuse. *Cf. State v. Willis,* 301 S.W.3d 644, 652 (Tenn. Crim. App. 2009) (wherein "[t]he defendant used the tactic of . . . filing complaints against [his lawyers] with the Board of Professional Responsibility as a means of coercing the court into discharging counsel and . . . the pattern was for the tactic to be employed as trial dates approached"). With respect to the subject matter of the defendant's complaint, we view the defendant's act of filing a complaint with the Board as merely raising an allegation of wrongdoing against his attorney. To succeed on an ineffective assistance of counsel claim, however, the defendant must show clear and convincing evidence of actual conduct that would require counsel to withdraw and the resulting prejudice. The petitioner has failed to do so.

*Hodge*, 2011 WL 3793503, at *5.

In his § 2254 petition, Petitioner argues that the trial court's order on post-conviction misstated the facts and misapplied the law (Doc. 1 at 65). Petitioner claims that the trial judge's failure to conduct an inquiry and, thereafter, to appoint Petitioner new counsel, was a violation of clearly established federal law and resulted in Petitioner being denied meaningful representation by counsel (*Id.* at 67). He further argues that trial counsel should have been dismissed as his attorney of record when he became a witness for the defense (*Id.*).

However, Respondent highlights some important facts seemingly left out of Petitioner's argument. Specifically, that trial counsel testified at Petitioner's post-conviction hearing that he met with Petitioner seventy-seven times in three years and that he and Petitioner got along well (Doc. 14 at 25, *citing* Doc. 12-21). Counsel also testified that there was no breakdown in communication with Petitioner that he felt would have necessitated his withdrawal as counsel (*id.*). Counsel further testified that he had never had a bar complaint filed against him and Petitioner failed to produce any testimony at the post-conviction hearing to dispute trial counsel's testimony (*id. citing* Doc. 12-21). After a review of the record, this Court agrees that the state court's adjudication on this issue was proper in finding that nothing in the record indicates that the

attorney-client relationship between Petitioner and trial counsel was "irretrievably fraught with irreconcilable conflict or lack of communication, such that trial counsel could no longer provide Petitioner with professionally constitutionally adequate representation" (*id*. at 25).

This Court finds that Petitioner has not met his burden of demonstrating that he is entitled to relief on this claim as he has not provided any evidence to diminished the deference owed to the state court's factual findings under § 2254(d). As explained by the state court, the mere act of filing a complaint with the Board merely raises an allegation of wrongdoing but in no way establishes that counsel had an actual conflict of interest which prevented him from properly performing his duties. *Hodge*, 2011 WL 3793503, at *5, *citing* Tenn. R. Sup. Ct. 8.

Further, Petitioner complains that a conflict of interest also arose when "[trial counsel] became essential defense witness" (Doc. 1 at 67). However, this argument is moot based on the above analysis regarding trial counsel strategic decision to forego testifying against Bolden. Petitioner improperly raises false argument when he states that trial counsel made the decision not to testify regarding his interview with Bolden "without informing [Petitioner] of any other options, without receiving [Petitioner's] input, and without receiving [Petitioner's] informed consent" (Doc. 1 at 68). A review of the records shows that Petitioner testified that, at the time the decision was made, he had discussed the issue with trial counsel agreed with trial counsel's decision not to testify (Doc. 12-31 at 69).

Based on the evidence available in the record, the state court's decision followed the application of law found in *Strickland*. This Court finds that the analysis of the state-court was not contrary to and did not involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings. Accordingly, Petitioner is not entitled to relief on this claim.

## VI.    *BRADY* CLAIM

Petitioner argues that the state withheld favorable evidence that could have supported his defense–specifically, when it failed to disclose the mental health records of Lorraine Young–and that the failure to disclose these records violated *Brady v. Maryland*, 373 U.S. 83 (1963), (Doc. 1. at 70).

The Due Process Clause of the Fourteenth Amendment requires that the state disclose to criminal defendants "evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady*, 373 U.S. at 97)).   "Even in the absence of a specific request, the prosecution has a duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Trombetta*, 467 U.S. at 485 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

To establish a *Brady* claim, a petitioner must show that the state withheld exculpatory evidence material to either the petitioner's guilt or punishment.  *Brady*, 373 U.S. at 87.  The Supreme Court has articulated three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (internal quotation marks omitted).   "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (internal quotation marks omitted).

Petitioner filed an amended petition for post-conviction relief claiming, *inter alia*, that prosecutors failed to "provide to the petitioner any records concerning Ms. Young which relate to her mental health or substance abuse treatment at [Lakeshore Mental Health Institute]." (Doc. 12-19.) Following the post-conviction court's denial of the claim, the TCCA analyzed the issue as follows:

> The petitioner next complains that the State withheld exculpatory evidence when it failed to produce the medical records pertaining to Ms. Lorraine Young held at Lakeshore Mental Health Institute in response to trial counsel's generalized requests for the medical records of the State's witnesses. It is well established that "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, (1963). However, in this case, the petitioner's claim fails because the prosecution did not actually suppress Ms. Young's medical records and the records at issue would not have been material to the defense.
>
> The petitioner argues that the State suppressed the evidence because the evidence was contained in a state facility and the State failed to locate and disclose those records. To rule in the petitioner's favor on these facts would be tantamount to ruling that the State must search every state facility for potential records pertaining to every prosecution witness in every case. We have little difficulty determining that *Brady* and its progeny do not impose such a requirement on the State. *Brady* generally does not require the State to affirmatively seek out exculpatory evidence. *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). While we have hinted in the past that some leeway may exist in this general rule where the records sought are already "possessed by or under the control . . . of [a] government agency," *see id.*, this caveat is meant to refer to a prosecutor's affirmative "duty to learn of any favorable evidence known to the others acting on the government's behalf *in the case,* including the police." *Kyles v. Whitley*, 514 U.S. 419, 508 (1995) (emphasis supplied). If the prosecution is ever, in fact, under an affirmative duty to seek out potentially exculpatory files from a government agency that is entirely unrelated to law enforcement or the prosecution of the defendant's case, it is certainly not under circumstances such as these.
>
> The record reflects that the prosecution had nothing in its files to indicate that Ms. Young suffered from mental health issues, and nothing indicates that the prosecution was aware that Ms. Young had ever sought mental health treatment or that mental health records might exist at any particular state facility. Absent being specifically requested to examine or produce records from Lakeshore Mental Health Institute (see *State v. Jeffrey R. Allen and Jennings Michael Coen*, No. 03C01–9708–CC–00367, 1999 Tenn. Crim. App. LEXIS 17 at ——10–11, 1999

WL 5173 (Tenn. Crim. App. Jan. 8, 1999)) or, at the very least, being placed on some sort of notice that exculpatory records existed there, the prosecution had no affirmative duty to seek out such records and is not responsible for the consequences of any failure to locate them. To rule otherwise would be to impose on the prosecution a duty to investigate its own witnesses that is simply breathtaking in its scope and arduousness. In order to secure any conviction, the prosecution would have to request any and all documents pertaining to every prosecution witness from every state agency and review all of those records for potential exculpatory material—or run the risk of having the conviction overturned if any such records should be discovered at a later time. Such a broad duty to search would be entirely inconsistent with our previous determination that the State bears no greater duty to search for exculpatory evidence than a defendant; "[w]hen exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery." *Marshall*, 845 S.W.2d at 233 (*quoting United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985)).

Moreover, the records at issue were not material within the meaning of *Brady*. "Evidence is material when there is a reasonable probability that the result of the proceeding would have been different had the exculpatory evidence been disclosed." *Sample v. State*, 82 S.W.3d 267, 270–71 (Tenn. 2002). In making this determination, "a reviewing court must determine whether the defendant has shown that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict." *Johnson v. State*, 38 S.W.3d 52, 58 (Tenn. 2001) (*quoting Irick v. State*, 973 S.W.2d 643, 657 (Tenn. Crim. App. 1998)).

After thorough review, we conclude that the newly discovered medical records do not place the petitioner's case in a substantially different light. Many of the medical records at issue postdate the trial or concern medical problems that would not have affected Ms. Young's credibility as a witness. While some portion of the records chronicle Ms. Young's struggle with alcohol use, when she was on the stand, Ms. Young freely admitted to partaking of alcohol the evening before she witnessed the crime. The petitioner's trial counsel extensively cross-examined Ms. Young concerning the extent of her intoxication and impeached her using prior inconsistent statements that she made to the police. Medical records reflecting at most the witness' prior tendency towards alcohol use would not have rendered this cross-examination appreciably more effective. While the records also contain some reference to Ms. Young experiencing occasional auditory hallucinations, the likelihood that a jury would believe that Ms. Young happened to hallucinate an argument and a crime that were substantially identical in their details as those attested to by other witnesses is remote in the extreme. Finally, we observe that even if the medical records had contained material that could have been used to significantly strengthen the petitioner's challenge to Ms. Young's credibility, the testimony of three other eyewitnesses to the crime would still remain. The

> discovery of these new medical records simply does not undermine our confidence in the jury's verdict.

*Hodge*, 2011 WL 3793503, at *6–7.

The purpose of Petitioner's desire to obtain these medical records was to impeach Ms. Young. In the context of impeachment evidence, "[w]hen the reliability of a given witness may well be determinative of guilt or innocence, the nondisclosure of evidence affecting credibility falls within" the *Brady* rule requiring a new trial. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence has been deemed material for *Brady* purposes "if the witness whose credibility is attacked provides the only evidence linking the defendant to the crime or where the impact of the evidence on the witness's credibility would have undermined a critical element of the prosecution's case." *Hill v. Mitchell*, No. 1:98-cv-452, 2012 WL 995280, at *5 (S.D. Ohio Mar. 23, 2012) (citing *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996)); *see, e.g., Robinson v. Mills*, 592 F.3d 730, 736–37 (6th Cir. 2010) (holding "the suppressed evidence of Sims' status as a [confidential informant] is material under *Brady* because Sims was the State's star witness and only her testimony contradicted or undermined Robinson's assertion that he killed Irwin in self-defense").

This Court determines that the TCCA correctly confirmed the post-conviction court's finding that the non-disclosure of Ms. Young's medical records does not constitute a *Brady* violation, as her testimony was not "determinative of guilt or innocence" in Petitioner's case and was thoroughly cross-examined by Petitioner's counsel. *Hodge*, 2011 WL 3793503, at *6. The record clearly shows that at least three other witness identified Petitioner as the shooter.

Petitioner failed to establish suppression of evidence in his habeas petition. Prosecutors stated during Petitioner's hearing on his motion for a new trial that they did not have any records relating to Young's mental health treatment (Doc. 12-11). The TCCA noted that nothing in the

record indicates that Young suffered from mental health treatment or that mental health records might exist. *Hodge*, 2011 WL 3793503 at *6. The records were easily obtainable by Petitioner himself, as he did for the post-conviction hearing–and when the designed evidence is equally available to the prosecution and the accused, "the accused must bear the responsibility of [his] failure to seek its discovery." *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985).

Ultimately, Petitioner has not shown that this decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to habeas relief on the basis of this claim.

## VII. CONCLUSION

For the reasons set forth above, Petitioner's § 2254 petition (Doc. 1) will be **DENIED** and this action will be **DISMISSED**.

## VIII. CERTIFICATE OF APPEALABILITY

The Court must consider whether to issue a certificate of appealability ("COA") should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the

petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack*, 529 U.S. at 484. After reviewing each of Petitioner's claims, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right as to any claims. Because the Court's assessment of Petitioner's claims could not be debated by reasonable jurists, such claims are inadequate to deserve further consideration, and the Court will **DENY** issuance of a COA. *See* 28 U.S.C. § 2253; Fed. R. App. P. 22(b); *Miller-El*, 537 U.S. at 327.

**An Order Will Enter.**

/s/
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**